J-A15001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

IN RE: ADOPTION OF J.K., A MINOR   :   IN THE SUPERIOR COURT OF
                                    :        PENNSYLVANIA
                                    :
APPEAL OF: J.T., MOTHER             :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :   No. 1445 WDA 2022

Appeal from the Order Entered November 10, 2022
In the Court of Common Pleas of Washington County
Orphans' Court at C-63-OC-2020-778

BEFORE:   MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED: AUGUST 4, 2023**

J.T. (Mother) appeals from the order involuntarily terminating her parental rights to J.K. (Child), who was born in September 2018.[1]  We affirm.

Child was approximately one month old when he came to the attention of Washington County Children and Youth Services (CYS).  The orphans' court explained:

> On October 29, 2018, [CYS] first became involved with the family in response to a report of domestic violence between Mother and Father.  [CYS] instituted a safety plan and [] Child was placed with two (2) independent and separate caregivers.  Both caregivers subsequently indicated an inability to care for Child.
>
> On January 4, 2019, through [a] shelter order, [] Child was removed from Mother's care, and on January 10, 2019,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court terminated the parental rights of M.N.K. (Father) by order dated September 17, 2021.

adjudicated dependent. [Mother] stipulated to the adjudication which included findings that:

● Mother was an indicated perpetrator of abuse as to another child, under which circumstances she was arrested and pleaded guilty to the charge of Endangering the Welfare of Children.

● Concerns were raised regarding Mother's mental health stability.

● Concerns were raised with [Mother's] long history of domestic violence.

At the time of adjudication, the [c]ourt ordered [that Mother]:

● Complete a psychological evaluation with risk of harm assessment, following all recommendations;

● Participate in mental health treatment through [Southwestern Pennsylvania Human Services (SPHS)];

● Maintain safe and appropriate housing; and

● Complete a nurturing parenting curriculum.

Orphans' Court Opinion, 11/10/22, at 2.

Mother had "inconsistent progress and compliance throughout the initial case proceedings." *Id.* at 3. In January 2020, CYS placed Child in his current foster home. N.T., 9/22/22, at 14. The orphans' court observed that "as a result of some significant progress and completion of court-ordered services, [Mother's] visitation [with Child] was increased." Orphans' Court Opinion, 11/10/22, at 3.

On July 16, 2020, CYS petitioned to terminate Mother's parental rights. The orphans' court denied the petition on September 17, 2021, as Mother was

compliant with her permanency plan. *See* Orphans' Court Opinion, 11/10/22, at 3; *see also* N.T., 9/22/22, at 17-18, 38. In the last months of 2021, Mother stopped complying with her permanency plan. She was inconsistent with drug and alcohol testing, and missed or was late to her visits with Child. N.T., 9/22/22, at 31-40.

Approximately one month after the orphans' court denied termination, Mother was incarcerated on charges of harassment and simple assault involving her neighbor, who was also "her paramour."[2] *See* Orphans' Court Opinion, 11/10/22, at 3; *see also* N.T., 9/22/22, at 22-23; 154-55. Following a review hearing on October 26, 2021, the court "found [Mother] to have minimal compliance with the permanency plan and no progress toward alleviating the circumstances which necessitated the original placement." Orphans' Court Opinion, 11/10/22, at 3. The court changed Child's permanency goal from reunification to adoption, with a concurrent goal of permanent legal custodianship. *See* N.T., 9/22/22, at 25. The court also ordered Mother to participate in mental health treatment; random drug and alcohol screens; and visitation with Child in jail and upon Mother's release from jail. *Id.* at 25-26, 38.

_____

[2] Mother was incarcerated from October 24, 2021, to November 17, 2021. The criminal charges were dismissed after the neighbor/paramour declined to testify. N.T., 9/22/22, at 24.

On January 19, 2022, CYS filed another petition for termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court held a hearing on September 22, 2022. CYS presented testimony from caseworker, Ashley Blake, and expert psychologist Michael Crabtree, Ph.D. The Court Appointed Special Advocate (CASA), Carol Schuck, testified on behalf of Child.[3] Mother testified in opposition to termination.

CYS's witnesses agreed that Mother had participated in services, including mental health treatment and domestic violence programs, which the court had ordered as part of Mother's permanency plan. N.T., 9/22/22, at 50-51, 53. However, Ms. Blake expressed concerns about Mother's "ability to identify" Child's needs, and testified that Mother was unable "to demonstrate her ability to apply what she has learned." Orphans' Court Opinion, 11/10/22, at 9; *see also* N.T., 9/22/22, at 19, 53, 92.

Ms. Blake testified that after the orphans' court denied the first termination petition in September 2021, Mother became inconsistent with

_____

[3] The court determined there was no conflict in Erin Dickerson, Esquire, representing Child's legal and best interests. Thus, the mandate that counsel be appointed "to represent the child," 23 Pa.C.S.A. § 2313(a), is satisfied. **See In re T.S.**, 192 A.3d 1080, 1088, 1093 (Pa. 2018) (citation omitted) ("where a child's legal and best interests do not diverge … an attorney-GAL representing the child's best interests can also fulfill the role of the attorney appointed per Section 2313(a) to represent the child's legal interests.").

Like CYS, Attorney Dickerson has filed a brief in support of termination. **See** Participant's Brief at 7-18.

attending supervised visits with Child; in June 2022, the court reduced Mother's visits to once weekly. *Id.* at 44-45, 59.

At the time of the termination hearing, Child was one month shy of his fourth birthday, and had spent nearly his whole life in the custody of CYS. Child has resided in a pre-adoptive foster home since January 2020. N.T., 9/22/22, at 14. Ms. Blake testified that Child has been diagnosed with expressive language disorder and developmental delays, and receives speech and occupational therapy; Child also has a heart murmur which requires the care of a cardiologist. *Id.* at 13-14.

By order entered on November 10, 2022, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother presents three issues for review:

> 1. Did the [orphans'] court err in finding that [CYS] submitted clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), and (a)(8)?
>
> 2. Did the [orphans'] court err in failing to adequately consider domestic violence and Covid's role in interfering with efforts of reunification?
>
> 3. Did the [orphans'] court err in failing to adequately consider the effect that termination of parental rights would have on [Child] and [his] emotional bond with Mother, as analyzed under 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 4.

In considering Mother's issues, we examine whether termination is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Our Supreme Court has explained that an abuse of discretion "does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard reflects our deference to trial courts, who observe the parties first-hand, often in multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123–1124.

Under 23 Pa.C.S.A. § 2511, the involuntary termination of parental rights requires a bifurcated analysis. First, the orphans' court must determine whether the parent's conduct provides grounds for termination under Section 2511(a). If the court finds that it does, it must then consider the child's needs

and welfare pursuant to Section 2511(b). The petitioner has the burden to prove by clear and convincing evidence that its asserted grounds for termination under both Section 2511(a) and (b) are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Clear and convincing evidence is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

In reviewing Mother's issues concerning Section 2511(a), we need only agree with the orphans' court as to any one subsection. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze Subsection 2511(a)(2), along with 2511(b), which provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

> income, clothing and medical care if found to be beyond the control of the parent. …

23 Pa.C.S.A. § 2511(a)(2), (b).

Grounds for termination under Subsection 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

With respect to Section 2511(b), the court must "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The "emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). A trial court "can equally emphasize the safety needs of the child" under Section 2511(b). *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). Further, the "analysis of the parental bond is but one part of the overall" Section 2511(b) analysis. *In the Interest of K.T.*, --- A.3d ----, 2023 Pa.LEXIS 829, *54 (Pa. June 21, 2023); *see also In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). The court must examine the effect of severing a bond, which includes "a determination of whether the bond is necessary and

beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***Id.*** at *54-55.

The Pennsylvania Supreme Court recently explained:

Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. ***See E.M.***, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

***Id.*** at *50 (some citations omitted). The High Court distinguished "extreme emotional consequences" from "adverse impact", and specifically cautioned that a court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." ***Id.*** at *50, 56.

In reiterating that the parental bond is only one part of the analysis, the Supreme Court held that the "Section 2511(b) inquiry must also include consideration ... [of] certain evidence **if it is present in the record**." ***Id.*** at *55 (emphasis in original); ***see also id.*** at n.28. The factors at issue in ***K.T.*** related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home and her bond with her foster parents; and whether the foster home met her developmental, physical, and emotional needs. ***Id.*** The Supreme Court emphasized that

these factors were not exhaustive. *Id.* at n.28. Rather, the circumstances of each case determine the factors to be considered.

Mindful of the foregoing, we turn to Mother's first two issues, which concern grounds for termination under Section 2511(a)(2). Mother primarily argues that the orphans' court abused its discretion in weighing the October 2021 domestic violence incident against her. *See* Mother's Brief at 25. Mother states she was "attacked for 'not preventing' domestic violence. However, it is impossible to 'prevent' domestic violence, particularly in regard to a significant other ...." *Id.* at 23. Mother asserts:

> The [orphans' court's] sole focus seemed to be that Mother should have prevented any domestic violence from occurring. This is simply impossible. Mother is unable to control the actions of others.

*Id.* at 25.

Mother claims the October 2021 incident was not indicative of her failure to learn from her participation in domestic violence programs. *Id.* at 26. She also claims the orphans' court abused its discretion in weighing her domestic violence history against her because Child was never present during the incidents. *Id.* at 25. Mother's claims are unavailing.

The orphans' court explained:

> [I]t is unrefuted that [Mother] has participated with many of the services recommended and ordered on her behalf. Nevertheless, despite such services, [Mother] is engaging in the same behaviors that led to the original shelter and adjudication of [Child]. These behaviors have a direct impact on her ability to provide strong and continuous parental ties to [Child] and to provide for his mental, emotional and educational well-being. Dr. Crabtree testified that

- 10 -

[Mother]'s participation in services has "done little to change her behavior," and further opined that [Mother] "could not re-direct her behaviors after extensive treatment"[,] "is not in a position to parent a child"[, and] "her failure to progress reflects an inadequate ability for problem solving in conflict."

Orphans' Court Opinion, 11/10/22, at 20. The record supports the court's findings.

Dr. Crabtree conducted psychological evaluations of Mother in June 2020, January 2021, and February 2022. N.T., 9/22/22, at 79. He diagnosed Mother with chronic stress disorder and personality disorder not otherwise specified. *Id.* at 84. Dr. Crabtree testified that during his final evaluation, Mother described the October 2021 incident as

an arrest that was subsequent to a domestic dispute with a neighbor of hers with whom she had developed a relationship. And that from her description that the individual wanted to spend time with her. She was just interested in watching television, and he had damaged the television and she had physically ... confronted him in some fashion.

*Id.* at 87. Dr. Crabtree opined that the incident was "an egregious example of [Mother's] inability to redirect [her] behavior." *Id.* at 88.

Dr. Crabtree further testified that he had reviewed medical records from Mother's mental health therapist.[4] *Id.* at 90. Dr. Crabtree testified that the therapist's records

_____

[4] In her second issue, Mother baldly asserts that "Covid affected services, particularly missing mental health appointments. Testimony established that Mother's therapist canceled at least 4 mental health appointments due [to] Covid." Mother's Brief at 25. We conclude that Mother waived this argument
*(Footnote Continued Next Page)*

- 11 -

were just filled with . . . a reflection of . . . the problems [Mother] had this week. And . . . there's a continual . . . inability to . . . handle [her] life circumstances in a fashion that would be typical of a normal emotionally healthy person.

*Id.* at 91.

Dr. Crabtree opined that Mother's personality disorder prevents her from changing her behavior, "[g]iven the intensity of the services provided and given that there has not been a dramatic change in behavior[.]" *Id.* at 95. He stated that Mother "is not at the point where I think that she is an effective parent." *Id.* at 92. For instance, Dr. Crabtree testified that in his first interactional evaluation between Child and Mother, Mother "did not have the capacity to empathetically interact with [C]hild and give appropriate kinds of emotional support and guidance to the play activity with [C]hild." *Id.* at 97. In his last interactional evaluation, he concluded Mother "still was not exhibiting the level of sensitivity that would be typical of the average parent." *Id.* at 97-98. Dr. Crabtree stated that Mother "did not have the capacity to see how her behavior was affecting [C]hild." *Id.* at 98. Dr. Crabtree testified that Child, due to his special needs, had "some sensory difficulties." *Id.* at

---

because she fails to develop it in any meaningful fashion or refer to anywhere in the record that supports the argument. *See* Pa.R.A.P. 2119(c)-(d); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that claim is waived where an appellant fails to provide any discussion with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review). Waiver notwithstanding, we would conclude this claim is without merit because the orphans' court did not find that Mother's conduct warranted termination for failure to attend mental health appointments.

110. He explained that Child "is more vulnerable" and "less resilient than an average child would be." *Id.* at 96. He also observed that Child showed no initial emotional reaction to Mother, and Mother did not say goodbye to Child at the end of the evaluation. *Id.* at 110-13.

With respect to Mother's inability to change her behavior, Ms. Blake's testimony was consistent with Dr. Crabtree as to Mother not applying what she has learned. *Id.* at 53. When Child's guardian *ad litem* (GAL) asked Ms. Blake, "would it be fair to say [Mother] is not evidencing an ability to use good judgment with respect to her actions and the individuals in which she chooses to associate with?", Ms. Blake responded: "That is correct." *Id.* at 56.

Ms. Blake also expressed concern that if Child was returned to Mother, she would not be able to provide for Child's needs. Ms. Blake stated:

> [Mother] was not participating in [Child's] doctor's appointments or any of his appointments for therapy, [and] if [Child] were to return home to her care, [Mother] would not understand the importance of those services and why it was important for him to continue to go ….
>
> When I had had conversations with [Mother] previously about [Child] possibly returning home[,] she had indicated that she was going to take [Child] and move across the state. She felt like he didn't have any special needs. He didn't need any of those services. So there were concerns that she wouldn't follow through with those [services].

*Id.* at 21.

When questioned by the GAL, Mother did not know Child's diagnoses. *Id.* at 165. To the extent she was aware that Child was diagnosed with a speech impediment, Mother disagreed. Mother testified, "I think [Child] is

- 13 -

fine. I just think that he just do[es] and say[s] things when he's ready to do and say things." *Id.*

Consistent with the above evidence, the record supports the orphans' court's determination that Mother's continued incapacity has caused Child to be without essential parental care, and Mother's incapacity cannot or will not be remedied. We thus discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2).

With respect to Section 2511(b), Mother argues CYS failed to satisfy its evidentiary burden "that severing the bond between Mother and [Child] would not cause detrimental harm to [C]hild." Mother's Brief at 27. Mother focuses on "detrimental harm." *Id.* However, as noted above, the Pennsylvania Supreme Court recently clarified that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *K.T.*, *supra* at *54.

Here, the orphans' court properly analyzed "whether a natural parental bond exists between [C]hild and parent and whether termination would destroy an existing, necessary and beneficial relationship." Orphans' Court Opinion, 11/10/22, at 24 (citing *In re K.Z.S.*, 946 A.2d 753[, 760] (Pa. Super. 2008)). The orphans' court explained:

> While not a constant or consistent presence in the life of [Child], the record establishes that [Child] enjoys seeing [M]other, gets upset when [M]other is late for visits, and calls [M]other, "mommy." Nevertheless, as testified to by Dr. Crabtree, during both his initial and final interactional evaluations between [Mother] and Child, [Mother] failed to show "the capacity to

empathize and provide for Child." [Dr.] Crabtree also testified and provided by report that he felt [Mother] had "no intimate connection" with [Child]. Finding a weak relationship between [Mother] and [Child], [Dr.] Crabtree opined that [Child]'s emotional and intellectual development would be enhanced by maintaining his bond with his foster parents.

Dr. Crabtree emphatically testified that it would be psychologically damaging to break the bond between the foster parents and [Child], stating that it was Child's "primary bond." **He opined that the bond between [Child] and [Mother] was not a necessary and beneficial bond**. Additionally, in a final statement on direct, Dr. Crabtree testified that adoption would best serve the Child's needs and the benefit of adoption would outweigh any harm of severing the relationship with [Mother].

CASA Carol Schuck testified that, in her opinion, [Child] should remain in his current placement with it being his "forever home." Caseworker Ashley Blake testified that [Child] is busy and happy in his pre-adoptive placement and calls his foster parents Mommy and Daddy. Ms. Blake testified that [Child] looks to his foster family for his daily needs. On behalf of [CYS], Ms. Blake stated the opinion that [Child]'s best interests would be served by being adopted by his foster family where he has lived for the majority of his life, where he is loved, where his physical and emotional needs are met, and where he is stable and healthy. Th[e] [c]ourt agrees.

**Th[e] [c]ourt is tasked with not only determining whether a bond exists, but also the quality and value of the bond**. Here, while the court acknowledges that a bond exists between [Mother] and [Child], th[e] [c]ourt finds little support that such bond is necessary and beneficial. Of greatest priority is th[e] [c]ourt's evaluation of the needs and welfare of [Child,] and evaluation of the entire record of the dependency and the orphans' court proceedings supports the conclusion that [Child]'s needs and welfare are best met with a termination of [Mother]'s parental rights.

Orphans' Court Opinion, 11/10/22, at 24-25. Again, the orphans' court's

findings are supported by the record, and its application of the law is without

error.

Ms. Blake testified that Child calls Mother "Mommy," and he "likes to go to the visits and play with her." N.T., 9/22/22, at 58. In response to question by the GAL, Ms. Blake testified:

Q. So it's . . . like a playdate for him?

A. Right.

Q. And he doesn't ask about visits; correct?

A. He does not. He does get upset when he is brought to the visit and [Mother] doesn't show and then he doesn't get to play.

   So I don't know if he looks forward to them, but when they tell him he's going, he does get excited about being able to play.

Q. And, in fact, that happened recently didn't it . . . that the Agency transported [Child], took him out of school, [and school] is something he enjoys; correct?

A. Something he enjoys and is recommended, yes.

Q. Took him out of school to go to a visit with Mom, told him that he was going to that visit, and [Mother] confirmed and then never showed up?

A. Correct.

Q. And [Child] was emotional that he had been taken out of school and his day was disrupted; correct?

A. That is correct. So we have gone to [] not taking him out of the car until she shows up now, so he doesn't go into the visitation room and then get upset when he has to leave.

*Id.* at 58-59.

Dr. Crabtree also testified that Child does not have a beneficial and necessary bond with Mother. *Id.* at 101. Based on his observations and psychological testing, he described Child and Mother's relationship as "weak."

*Id.* at 99. He explained that Mother did not display affection toward Child and did not demonstrate an emotional connection with him. *Id.* at 98-99. Dr. Crabtree testified that he observed no bond between Mother and Child during the first interactional evaluation in 2020, although he observed improvement in 2021, which he did not further specify or describe. *Id.* at 115. Notably, after his final evaluation in 2022, Dr. Crabtree determined that Mother and Child's relationship had regressed. *Id.* at 115-16.

Dr. Crabtree also conducted interactional evaluations between Child and his pre-adoptive foster parents. *Id.* at 99. Based on his observations and testing, Dr. Crabtree opined that Child has a strong emotional connection with his foster family. *Id.* at 100. He stated that foster parents "have the capacity for receiving feedback and proving their ability to give guidance to [C]hild. [This] indicates a richness of the relationship between the foster parents and [Child] that … is not only admirable but … really essential for [C]hild's development." *Id.* at 102. Dr. Crabtree reiterated, in response to further questioning by counsel for CYS, that Child's relationship with his foster parents is essential for Child's development. *Id.*

Ms. Blake confirmed the bond between Child and his foster parents, evidenced by Child displaying a "great deal of affection" for them, and the foster parents being "very interactive with him." *Id.* at 57. She stated:

> He is loved there. They are able to meet . . . every aspect of [Child]'s, not only basic needs[,] but emotional needs, behavioral needs, psychological needs.

They provide him with all of that stability, and that's where [Child] calls h[ome]. He calls his foster parents Mommy and Daddy, and he knows that he is loved there.

*Id.* at 60. Ms. Blake confirmed that the foster parents are a pre-adoptive resource for Child, and at the time of the hearing, Child had resided in the foster home for 32 of the 44 months of placement. *Id.* at 45, 61.

Likewise, the CASA supervisor testified that Child's foster parents meet Child's developmental, physical, and emotional needs and welfare. Ms. Schuck stated that foster parents

have really tuned into [Child] as a human being and worked through all of those difficult times with him, which was very impressive to me.

So every time something came up, they were very concerned about it, and they sought the advice of CYS that are there services that can be provided. And they inconvenienced themselves many times to make sure that those problems were addressed. And he's really been reacting to those in a positive way.

And they've just helped him to thrive. He has so much potential because . . . there are just things that he had to learn to cope with, and he has, and I'm so happy for his future in that sense.

*Id.* at 69. Ms. Schuck explained, "in the past, we've had a lot of issues with [Child] sleeping and [having] night terrors. Lots of different things that he has really worked through. So it has been a pleasure to see [Child] grow." *Id.* at 65. She further stated that Child "loves school[,] and he's really getting up on his own and ready to go to school." *Id.*

Based on the above testimony, we discern no abuse of discretion by the orphans' court in determining that Child's needs and welfare are served by

termination pursuant to Section 2511(b). Accordingly, we affirm the orphans' court's order involuntarily terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/4/2023